# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUTH DUNN-PRAGO,<br><br>                   Plaintiff,<br>  vs.<br><br>SAN DIEGO POLICE OFFICER SHARKI, ID No. 5986, et al.,<br><br>                  Defendants. | CASE NO. 10cv2400-LAB (WVG)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

      Ruth Dunn-Prago[1] alleges that on the night of July 30, 2009 four San Diego police officers entered her home without probable cause, falsely arrested and detained her, and in the process physically battered her. Her complaint doesn't get much more specific than that. (SAC ¶¶ 4–5.) She accuses the officers of: (1) violating her rights under United States and California law; (2) assault and battery; (3) false arrest and imprisonment; and (4) negligence. She also accuses the City of San Diego itself of violating her civil rights.

      The Defendants tell a completely different—and factually much richer, much more organized—story. To broadly summarize: The police officers were doing surveillance work in the vicinity of Dunn-Prago's home, looking for drug or gang-related activity. They saw what they believed was a drug transaction between two men. When they approached and

---

[1] The pleadings spell Plaintiff's last name both "Prago" and "Pargo." The Court will assume Prago is the correct spelling.

tried to talk to one of the men, he fled into Dunn-Prago's open garage. They pursued him, and in the course of trying to apprehend him Dunn-Prago interfered, both vocally and physically. She was arrested, put in the back of a police car, and ultimately released with a citation, which she signed, for interfering with and battering a police officer.

Now before the Court is the Defendants' motion for summary judgment.

## I. Legal Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the moving party, it is the Defendants' burden to show there is no factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet this burden, they must show that Dunn-Prago lacks evidence to support her claims. *Id.* at 325. If they can do that, Dunn-Prago must set forth "specific facts" to show there is a genuine issue for trial. *Id.* at 324.

The Court considers the record as a whole and draws all reasonable inferences in the light most favorable to Dunn-Prago. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). The Court may not make credibility determinations or weigh conflicting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, the Court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Not all alleged factual disputes will serve to forestall summary judgment; they must be both material and genuine. *Id.* at 247–49. "If conflicting inferences may be drawn from the facts, the case must go to the jury." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) (citations omitted).

## II. First Cause of Action - Deprivation of Civil Rights (Against Individuals)

The scope of Dunn-Prago's first cause of action isn't exactly clear. Generically titled "Deprivation of Civil Rights" in her complaint, it "arises under the Fourteenth Amendment to the United States Constitution and Section 1983 and 1988 of Title 42 of the United States Code as hereinafter more fully appears, under the Fourth and Fourteenth Amendments."

(SAC ¶ 1.) The inclusion of the Fourteenth Amendment is confusing. Dunn-Prago appears to have three constitutional grievances. First, Defendants entered her home without probable cause. Second, Defendants used excessive force when they arrested her. Third, Defendants arrested her without probable cause. The first grievance obviously arises under the Fourth Amendment, and the second and third grievances do too. *See Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) ("Claims for excessive force are analyzed under the Fourth Amendment's prohibition against unreasonable seizures."); *Dubner v. City and County of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001) ("A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment . . . ."). Dunn-Prago has thrown the Fourteenth Amendment into the pot but done nothing to articulate what the substance of the Fourteenth Amendment violation is.[2]

### A.  Unlawful Entry

Dunn-Prago lives at 1475 50th Street in San Diego. This block of 50th Street runs north-south. On the south end, it dead-ends into a cul-de-sac, and Dunn-Prago's home is at that dead-end. On the north end, it meets Federal Boulevard, which runs east-west. A couple of blocks east of 50th Street is Euclid Avenue, and several blocks west of 50th Street is 47th Street. There is no dispute that on the night in question the individual Defendants, who are members of the San Diego Police Department's "Street Gang Unit and Gang Suppression Team," were doing surveillance work on and around Federal Boulevard between 47th Street and Euclid—an area that encompasses the block of 50th Street on which Dunn-Prago lives.

---

[2] Perhaps it is her belief that the Defendants' actions were racially motivated. (*See* SAC ¶ 4.) She pleads this claim in a completely conclusory manner, however, and makes no effort to substantiate it. The Court is therefore inclined to disregard it, as Defendants have, and focus on the Fourth Amendment violations Dunn-Prago alleges. In her own deposition, when asked why she believed the Defendants' actions were racially motivated, she answered, "'Cuz all of them — the majority of them was white. There's — there's other black officers in — in — over there in Fairmount." (Dunn-Prago Dep. at 141:1–6.) Asked for any other reason "why you think their actions were racially motivated" she turned instead to sex discrimination: "Yes, because I'm a female, and they never should've put their hands on me." (*Id.* at 141:7–10.) She conceded that she heard no racial epithets or slurs used that evening. (*Id.* at 11–12.) Dunn-Prago's accusations of racial prejudice are completely speculative.

1         Defendant Mark Bennett, specifically, was working undercover on Dunn-Prago's
2 block. Between approximately 10:00 and 10:30, Bennett saw what he believed was a drug
3 transaction between a man loitering in front of Dunn-Prago's home and a car that stopped
4 in the middle of the street in front of it. (Bennett Decl. ¶¶ 7–9.) This man was later identified
5 as Lamont Kyle. Bennett's belief was informed by his experience that "1475 50th Street and
6 the adjacent cul-de-sac area had a history of narcotics and gang related activity." (Bennett
7 Decl. ¶ 5.) In fact, one week prior officers had recovered a firearm in the area from two men
8 who gave 1475 50th Street as their address, and the Dodge Magnum they had been driving
9 was parked near 1475 50th Street that night. (Franchina Decl. ¶ 6; Oh Decl. ¶ 6; Sharki
10 Decl. ¶ 6.)

11         Dunn-Prago argues that Defendants' portrayal of her neighborhood is both prejudicial
12 and without foundation, but she offers no evidence whatsoever to paint a different picture
13 of it. Instead, she just takes Defendants to task for not producing any police reports that
14 prove the association between her home and criminal activity. (Opp'n Br. at 3.) She also
15 asserts that "[t]here was no hand-to-hand drug transaction," but relies only on the fact that
16 Bennett didn't identify the driver of the car or its make and model. (*Id.*) These kinds of
17 reflexive denials of Defendants' pleadings aren't enough to survive summary judgment. If
18 Dunn-Prago wants to legitimately contest the factual background Defendants have provided
19 to their encounter with Dunn-Prago, she must set forth specific facts. *Anderson*, 477 U.S.
20 at 248.

21         What happened next? Bennett got on his police radio and called for a "Trojan horse"
22 operation. This involved an unmarked police van driving down 50th Street towards Dunn-
23 Prago's home, followed by two police cars about ten seconds back. Bennett, again based
24 on his experience, believed certain individuals loitering outside of Dunn-Prago's home may
25 have been armed, and that they may attempt to flee; he called for the Trojan horse operation
26 with this in mind. (Bennett Decl. ¶ 11; Franchina Decl. ¶ 7; Oh Decl. ¶ 7; Sharki Decl. ¶ 7.)
27 Defendants Oh and Franchina were in the police van with several other officers. When the
28 van reached the cul-de-sac in front of Dunn-Prago's home, they got out and approached the

individuals loitering there. At the same time, Kyle walked quickly, or ran, towards the open garage of Dunn-Prago's home. (Franchina Decl. ¶ 8; Oh Decl. ¶ 8.) Dunn-Prago doesn't dispute any of this.

They do dispute, however, how far Kyle made it in Dunn-Prago's garage before Oh and Franchina got to him. According to Franchina, Kyle opened the door from the garage to the home and "enter[ed] the residence," where Oh finally grabbed him. (Franchina Decl. ¶ 9.) According to Oh, he ran towards Kyle and "attempted to tackle him in a bear hug as he was at the doorway leading into the house." (Oh Decl. ¶ 10.) He couldn't take Kyle to the ground, however, and "[Kyle] opened the door and entered the house, dragging me into the house with him." (*Id.*) Both Oh and Franchina saw Kyle empty objects from his pants inside the home. (Franchina Decl. ¶ 9; Oh Decl. ¶ 10.)

Dunn-Prago claims that Kyle never entered her home, presumably to establish that Defendants' eventual entry into her home lacked probable cause *and* that the drugs recovered in the home were planted by Defendants rather than discarded there by Kyle. She relies, first, on the declaration of Tommi Taylor. (*See* Dkt. No. 26-2.) Taylor, a friend of Dunn-Prago, was in the garage, near the door into the home, when Oh and Franchina pursued Kyle there. According to Taylor, Oh and Franchina "caught up to [Kyle] by the door by the steps by the door [sic] leading into the house." (Taylor Decl. ¶ 1.) She explains that while Oh and Franchina were subduing Kyle "the door to the house opened from the garage." (*Id.* at ¶ 2.) This testimony isn't at all inconsistent with that of Oh, who claims that Kyle essentially dragged him into Dunn-Prago's home as he tried to subdue him. It's also not meaningfully inconsistent with Franchina's testimony that Oh grabbed Kyle once he opened the door and entered the residence. Dunn-Prago relies, second, on the deposition testimony of LaDelia Bradford. Bradford claimed that Kyle "didn't make it into the house" because he fell or stumbled at the stairs leading from garage into the home, where he was tackled by the Defendants. (Bradford Dep. at 27–30.) In context, though, Ms. Bradford's testimony simply suggests that Kyle didn't make it into the home *before the Defendants got to him*; her testimony is consistent with Oh's account of grabbing Kyle by the door from the

garage into the home and then being dragged into the home by Kyle. Dunn-Prago relies, third, on the deposition testimony of Kirshawna Johnson. But Johnson's testimony, like Bradford's, doesn't do the work Dunn-Prago needs it to. Johnson merely claims that Kyle was inside the doorway from the garage to the home when Defendants apprehended him. (Johnson Dep. at 31:4–13.) She does not claim, as Dunn-Prago characterizes her testimony, that Kyle "never got past the doorway into the house."[3] (Opp'n Br. at 4.) Dunn-Prago relies, finally, on the deposition testimony of Dante Dunn to establish that Kyle never made his way into her home. Dunn was standing in the driveway to the home when Kyle walked past him into the garage. (Dunn Decl. at 42:18–22.) Dunn testified in his deposition that he didn't *see* Kyle enter the home, but he also testified that he didn't *know* whether Kyle entered the home, and that when the officers pursued Kyle into the garage he continued to look out to the street. (Dunn Dep. at 44:19–24; 45:3–8.)

Defendants have presented evidence that their entry into Dunn-Prago's home was reasonable. They were doing surveillance work in an area known for its drug and gang activity when Bennett believed he witnessed a drug transaction in front of Dunn-Prago's home. Defendants approached Kyle, and he fled into Dunn-Prago's garage. Defendants pursued him, and ultimately (after a struggle) arrested him inside of Dunn-Prago's home. This does not constitute an unlawful entry. *United States v. Santana*, 427 U.S. 38, 42 (1976); *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001). Dunn-Prago has presented no credible evidence to undermine Defendants' account of their entry into her home. She offers only serial and empty denials of those accounts, which by themselves are

//
//
//
//

---

[3] In fact, Johnson explains that after she saw Kyle in the doorway from the garage to the home, she turned back to the street and saw other officers coming, at which point she asked them if they had a warrant and was escorted out of the garage. (Johnson Dep. at 31:16–21.) Johnson therefore didn't see the full struggle between Kyle and the Defendants.

inadequate to shield against summary judgment.[4]  *Anderson*, 477 U.S. at 256.  The Court therefore finds no genuine issue for trial, and Dunn-Prago's unlawful entry claim is **DISMISSED WITH PREJUDICE**.

### B.     Excessive Force and Unlawful Arrest

Dunn-Prago's excessive force and unlawful arrest claims arise out of Defendants' treatment of her once they apprehended Kyle.  Here, the factual accounts of Dunn-Prago and Defendants diverge greatly.

Defendants claim that Dunn-Prago *approached them* in her home, as they were struggling with and trying to arrest Kyle, and that she struck Oh in the back.  (Franchina Decl. ¶ 11; Oh Decl. ¶ 11.)  Here is Oh's account:

> Defendant Franchina assisted me and we were able to get Kyle to the floor in the living room area, but he continued to struggle with us.  I then observed a female, later identified as Ruthie Dunn-Prago, walk over to where we were struggling with Kyle.  I heard Ms. Dunn yell at us and I felt her hit my upper back several times.  I told Ms. Dunn to stop, but she did not.  Other officers began to arrive on the scene, so I diverted my attention to Ms. Dunn.  I placed my right hand on her upper chest and gently pushed her back away from me.  I observed Ms. Dunn step back.  While my attention was diverted, Kyle was able to get up and move closer towards the door to the garage.
>
> Kyle continued to struggle.  I heard an officer ask for handcuffs, so I deployed my handcuffs and placed it on Kyle's left wrist.  Kyle continued to resist and struggle.  I then heard Ms. Dunn yelling and advancing towards me and the other officers, so I had to divert my attention again to her.  I ordered Ms. Dunn back, but she did not comply.  I then extended my arm in front of her to keep her back from the officers and Kyle.

(Oh Decl. ¶¶ 11–12.)  Oh's account is corroborated by Bennett.  Bennett saw Dunn-Prago approach Oh and the other officers arresting Kyle; it was his impression that she wanted to see who they were arresting.  (Bennett Decl. ¶ 15.)  Bennett also saw Dunn-Prago touching

---

[4] Dunn-Prago's claims in her opposition brief that "there was no hand-to-hand drug transaction" and that "obviously [the marijuana] had to be planted" are extremely bold.  She attaches to her opposition brief the transcript from Kyle's criminal trial on charges that arose out of the incident at issue here.  *See People of California v. Lamont Kyle*, Ct. No. SCD222117.  The records from this case from the San Diego Superior Court substantiate that Kyle was convicted by a jury of possession for sale of a controlled substance *and* resisting an executive officer.  He was sentenced to a term of 6 years and 8 months.  The Court acknowledges that for the purposes of this case that doesn't *prove* that he was involved in a drug sale in front of Dunn-Prago's house.

the backs of the arresting officers. (*Id.*) Dunn-Prago ignored Bennett's instructions to back away, and as he approached her she backed into the bathroom in her house, pulled up her dress and sat down on the toilet. (Bennett Decl. ¶ 17; Sharki Decl. ¶ 14.) Bennett claims that he tried to close the bathroom door, but Dunn-Prago stuck out her foot to keep it open, saying she wanted to watch the arrest of Kyle. (*Id.*)

While this was going on, Oh told Sharki that Dunn-Prago had hit him in his back, and Sharki approached Dunn-Prago to arrest her. (Oh Decl. ¶ 14; Sharki Decl. ¶ 13.) He made this approach at the time that Dunn-Prago sat down on the toilet, and Bennett told him to let her finish. (Sharki Decl. ¶ 14.) Sharki did eventually arrest Dunn-Prago, explaining that she'd battered a police officer. (Sharki Decl. ¶ 15.) According to Sharki, he "used a minimal amount of force and placed Ms. Dunn's arm behind her back"; she resisted, he placed her arm in a wristlock, and then he applied handcuffs. (Sharki Decl. ¶ 16.) He walked her to a patrol car and sat her in the backseat. (Bennett Decl. ¶ 19; Sharki Decl. ¶ 17.) Through all of this, Sharki claims that Dunn-Prago was resisting and uncooperative, and at points hysterical. (Sharki Decl. ¶¶ 16–18, 22–24.) Defendants, in the end, decided to release Dunn-Prago on a citation for interfering with and battering a police officer, which she signed. (Bennett Decl. ¶¶ 20, 23; Sharki Decl. ¶¶ 20–21, 24.; MSJ, Ex. 1.)

Dunn-Prago's opposition to summary judgment doesn't offer a tight, substantiated narrative to counter the Defendants'.[5] (Her complaint doesn't offer one, either.) In fact, the

---

[5] In places, Dunn-Prago's opposition brief isn't even coherent. In her Statement of Facts, for example, describing a witness' testimony, she writes, "She also heard the plaintiff state 'what's going on' she also stated she heard more being said but could not see her. She heard Ruthie saying 'what's going on' someone said they were in pursuit of someone and then she heard something like, wait a minute what's going on and then a boom." With all due respect to Dunn-Prago's counsel, the Court is stunned that a brief alleging serious civil rights violations and seeking $7.5 million in damages would be so difficult to decipher. On the whole, Dunn-Prago's complaint and opposition brief are starving for organization and structure, starving for a proofreading, starving for a linear connection between facts and law, and give rise to the perception that serious thought and time were not put into them.

The headings don't even line up. The opposition brief goes from "II - Statement of Facts" to "IV - Plaintiff Is Entitled to Punitive Damages." This latter section, though, is really just a legal argument section, and the argument is perplexing at points. It opens with the quote "A person is ceased [sic] within the meaning of the Fourth Amendment when in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free." (Opp'n Br. at 8.) But the legal definition of a seizure is not at all

Defendants' own summary judgment memo does a *far* better job than Dunn-Prago's of laying out her case. (*Compare* MSJ at 6–11 with Opp'n Br. at 3–8.) Anyway, Dunn-Prago's basic story, from her own deposition, is that she was asleep on the night in question, woke up to the sound of her grandchildren crying, and went to the restroom across the hall from her bedroom. The time was approximately 10:15. (Dunn-Prago Dep. at 71:3–10.) Dunn-Prago didn't hear anything, and didn't see anything, when she walked from her bedroom to the restroom. (Dunn-Prago Dep. at 73:15–20.) As she was urinating, however, she saw an officer looking at her. (*Id.* at 72:8–11.) When she was finished urinating, she left the bathroom and saw four policeman "beating up" Kyle in or around the doorway from the garage into her home. (*Id.* at 72:12–18.) She also saw about 12 police officers in her hallway. (*Id.* at 72:25–73:1.) Dunn-Prago asked the officers, "Well, what's going on" and was told "Oh, we found what we was looking for." (*Id.* at 73:2–4.) She then said "You ain't found no drugs in my house" after which an officer said "Cuff her" and she was hit "up side the head with something" (*Id.* at 73:5–9.) Someone also stepped on her right calf. (*Id.*) She later testified in her deposition that after she heard the words "Cuff her" she was slammed to the floor and that it was her *left* calf that was stepped on. (*Id.* at 84:11–12; 85:16–20.) She could not recall whether she was hit in the face first or slammed to the floor first. (*Id.* at 84:21–85:1.) Either way, she was knocked out and woke up in a police car. (*Id.* at 86:2; 86:3–9.) Dunn-Prago's memory of the night is extremely limited. She does not know who hit her in the face or what she was hit with. (*Id.* at 85:2–9; 109:9–18). She doesn't actually recall someone stepping on her calf. (*Id.* at 85:24–25.) She equivocates on whether she actually remembers being handcuffed. (*Id.* at 86:11–87:7; 100:22–25.) She does not remember being taken outside and placed in a police car. (*Id.* at 87:8–10;

//

---

implicated by Defendants' summary judgment motion. At the end of the section, Dunn-Prago challenges Defendants' contention that Dunn-Prago's home and neighborhood have a reputation for drug and gang activity by arguing simply that "[n]o gang member was arrested on the night of the incident." (Opp'n Br. at 10.) That doesn't prove anything.
 That leaves the Court and the Defendants in the unenviable position of substantially outworking Dunn-Prago in this case, and putting more effort into making sense of her claims and arguments than she has put into crafting them.

111:1–3.) Dunn-Prago testified that the only witnesses to her encounter with the officers were the officers themselves. (*Id.* at 122:24–125:2; 129:6–12.)

Much of the testimony cited by Dunn-Prago to save her excessive force and unlawful arrest claims is either irrelevant, incompetent, or completely presumptuous. It is also presented in a stream-of-consciousness manner that is hard to follow and highly ineffective. Dunn-Prago highlights, for example, that Kirshawna Johnson heard Dunn-Prago scream inside the house and also heard the officers tell her to "get down." (Opp'n Br. at 5; Johnson Dep. at 39:7–9; 40:19–22.) She also highlights that Dante Dunn heard Dunn-Prago scream. (Opp'n Br. at 5; Dunn Dep. at 48:1–6.) This testimony, though, doesn't undermine the Defendants' account of what happened: Dunn-Prago got in the way of their arrest of Kyle and they had to take steps to remove her from the scene. Moreover, Dunn-Prago conceded in her own deposition that Johnson and Dunn didn't see what happened inside her home. (Dunn-Prago Dep. at 129:8–12.)

In fact, the Court doesn't know what to make of *most* witness testimony cited by Dunn-Prago in her opposition brief, but it certainly doesn't cut against the Defendants' account of Kyle's apprehension and Dunn-Prago's arrest.[6] Dunn-Prago argues that Denise

---

[6] In another chunk of writing that leaves much to be desired, Dunn-Prago recites serially the deposition testimony of Ella Pleasant without drawing any connection between it and the issues at hand:

> In Exhibit 7 the deposition of Ella Pleasant she points out at pg. 15, line 18–25 that men hangout [sic] in front of her house not down by Ruthie Dunn. She also points out at pg. 23, line 1–12 that she was the one who talked to an officer for 25 minutes just prior to July 30th a month or two before where they claimed was with [sic] Ms. Dunn which is not true. She also points out she had contact with officers in reference to Lamont Kyle who is her nephew prior thereto in front of her home pg. 26, line 12–23 and that she felt that they rude [sic]. She also points out at pg. 59, line 3–9 that Ms. Dunn didn't have any injuries to her face prior to the police coming to the house that evening.

(Opp'n Br. at 6.) Perhaps Dunn-Prago is trying to use Pleasant's testimony just to discredit the Defendants, or to argue that Dunn-Prago's home and the surrounding area aren't the haven for drug and gang activity that Defendants have portrayed them to be. But that is just the Court's guess. It cannot do anything with the fact that Pleasant previously spoke to some police officers about Lamont Kyle and thought they were rude. It cannot do anything with the fact that "she was the one who talked to an officer for 25 minutes" because it has

Gatewood "describes how abusively her mother was brought out in handcuffs." (Opp'n Br. at 5.) But the testimony cited isn't illuminating at all. Gatewood merely said that Dunn-Prago "was bent forward and she had her hands pushing them above her head – sorry. She had her hands bent back, not above her head, above her back." (Gatewood Dep. at 47:7–9.) Dunn-Prago cites Taylor's declaration that "I did hear Ruthie say 'what's going on' and someone responded that 'we are in pursuit of someone going into your house' and I heard her say 'wait a minute what's going on' and then I heard a boom." (Opp'n Br. at 7; Taylor Decl. ¶ 3.) Taylor also says, however, that she could and couldn't see Dunn-Prago, and the mere fact that she heard a "boom" says little that is helpful. Dunn-Prago cites Pleasant's deposition testimony that Dunn-Prago didn't have any injuries to her face prior to the night in question, as well as Gatewood's deposition testimony that Dunn-Prago had a golf-ball sized knot under her eye and complained of rib and leg pain, but their testimony isn't competent enough to link Dunn-Prago's alleged injuries to any of the Defendants' actions. (Opp'n Br. at 6; Gatewood Dep. at 63:7–64:14; Pleasant Dep. at 59:3–8.)

In light of the above, it would seem that Defendants are entitled to summary judgment on Dunn-Prago's excessive force and unlawful arrest claims. Miraculously, though, as poorly argued and substantiated as Dunn-Prago's opposition to summary judgment is, as unhelpful and irrelevant as her "witnesses'" testimony is to her claims, and as hazy as her own recollection is of the events in question, there's still a real dispute here. Dunn-Prago claims she was on the toilet *when* the police entered her house, and that when she left the bathroom she was battered, knocked unconscious, arrested, and transported to a police car. Defendants, on the other hand, claim that Dunn-Prago interfered with their arrest of Kyle, struck Oh in the back, and *then* used the toilet, after which she was gently arrested. While the Court sees no reason to credit Dunn-Prago's account of events, especially over that of the Defendants, it cannot make credibility determinations or weigh evidence at the summary

---

no idea what allegation of Defendants' that is intended to rebut, or what the substance and purpose of the rebuttal would be.

judgment phase.[7] *Anderson*, 477 U.S. at 255. *See also Nelson v. City of Davis*, 571 F.3d 924, 929 (9th Cir. 2009) ("A judge must not grant summary judgment based on his determination that one set of facts is more believable than another."); *Espinoza v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) ("Finally, this court has often held that in police misconduct cases, summary judgment should be granted only 'sparingly' because such cases often turn on credibility determinations by a jury."). Defendants' motion for summary judgment on Dunn-Prago's unlawful arrest and excessive force claims is therefore **DENIED**.[8]

### III. Second Cause of Action - Deprivation of Civil Rights (Against San Diego)

Here, Dunn-Prago accuses San Diego itself of violating her civil rights under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). *Monell*, of course, carves out an exception to the general rule that there is no respondeat superior liability under § 1983. That exception arises when a municipality's "official policies or established customs inflicts the constitutional injury." *Id.* at 708. An act of omission, such as a failure to train, may amount to municipal policy, but only when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). A municipality may also be held liable under *Monell* when "the individual who committed the constitutional tort was an official with final policy-making authority" or such an official "ratified a subordinate's unconstitutional

//

---

[7] Dunn-Prago denies hitting Oh in the back. (Dunn-Prago Dep. at 123:14–22.)

[8] Defendants go to substantial lengths to argue that qualified immunity applies here. The problem with that argument, as right as Defendants are on the general legal principles, is that it *assumes* Defendants' account of the facts is accurate. For example, they argue that Defendants acted reasonably in arresting Dunn-Prago because as they were arresting Kyle "they observed Plaintiff approaching them, yelling, and she struck Officer Oh several times on his upper back." (MSJ at 15.) The Court can't credit that account for qualified immunity purposes because it's flatly inconsistent with the account provided by Dunn-Prago herself. With respect to Dunn-Prago's excessive force claim, Defendants argue that qualified immunity should apply *even assuming* she was struck or thrown to the floor, but that's *also assuming* that she interfered with their arrest of Kyle and hit Oh in the back — both facts that Dunn-Prago contests. (MSJ at 16.)

decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).

Dunn-Prago, by the Court's count, offers four theories of *Monell* liability in her complaint, each without any supporting factual allegations: (1) It is the policy of the San Diego Police to use excessive force *on Dunn-Prago* (SAC ¶ 14); (2) Defendants' unlawful entry into Dunn-Prago's home, and their use of excessive force and unlawful arrest of her, was authorized and ratified by the San Diego Police Department (SAC ¶ 15); (3) San Diego Police failed to train or supervise Defendants (SAC ¶ 16); and (4) It is the policy of the San Diego Police to allow its officers to proceed without supervision and to use unconstitutional means *to detain Dunn-Prago* (SAC ¶ 18).

Dunn-Prago's *Monell* claim against San Diego is pled in a deplorably conclusory manner, and it is defended poorly in her opposition brief. The only "fact" she offers comes from Denise Gatewood, who recounted the following conversation with one of the Defendants in her deposition:

> Defendant: "No, we have to take someone from this house to jail."
>
> Gatewood: "Why is that?"
>
> Defendant: "It's money involved."

(Gatewood Dep. at 64:25–65:1.) It is plain to the Court that Dunn-Prago threw a *Monell* claim into the mix just for the sake of doing so and without any factual basis. She doesn't offer a single fact to show that it was the policy of the San Diego Police to violate her own constitutional rights. She doesn't offer a single fact to show that there was an obvious need for officer training and the Police Department was deliberately indifferent to it. She doesn't offer a single fact to show that the Defendants were themselves "policymakers" of the Police Department or that their allegedly unconstitutional conduct was ratified by a policymaker. She simply recites a parade of horribles against the individual Defendants—they planted evidence, they made false reports, they withheld exculpatory evidence—without establishing

//

a single connection between their conduct and the actual policies of the Police Department. Dunn-Prago's *Monell* claim is therefore **DISMISSED WITH PREJUDICE**.

### IV. Remaining Claims

Dunn-Prago's remaining claims can be clumped together for summary judgment purposes. Those claims are a violation of California Civil Code § 52.1, which just tracks § 1983, as well as claims for assault and battery, false imprisonment, and negligence. As the Court has already observed, there is a monstrous gap between the factual accounts of Dunn-Prago and Defendants that precludes summary judgment on her § 1983 claims insofar as they are premised on the use of excessive force and an unlawful arrest. Accordingly, Dunn-Prago's § 52.1 claim may go to the jury–on an excessive force and false arrest theory. Her claims for assault and battery, false imprisonment, and negligence may go to the jury as well. Defendants' arguments for summary judgment on these claims ask the Court to accept as true their account that Dunn-Prago interfered with their arrest of Kyle and struck Oh in the back. The Court simply cannot make that concession at the summary judgment phase in light of Dunn-Prago's deposition testimony that she was confronted by Defendants for the first time outside of her bathroom, hit on the head, and thrown to the floor.

### V. Conclusion

Dunn-Prago's § 1983 claim that is premised upon an unlawful entry into her home is **DISMISSED WITH PREJUDICE**. Her *Monell* claim against San Diego is **DISMISSED WITH PREJUDICE.** Her § 1983 claims that are premised upon the use of excessive force and an unlawful arrest, her identical § 52.1 claims, and her claims for assault and battery, false imprisonment, and negligence survive. Defendants' motion for summary judgment on those claims is **DENIED**.

The Court has to say that Dunn-Prago survives summary judgment just barely, and on the basis of little beyond her own testimony. As the Court has explained above, the testimony of her witnesses is, for the most part, incompetent, irrelevant, muddled, or otherwise unilluminating. The quality of her pleadings is wildly disproportionate to the gravity of her grievances and the relief she seeks, so much so that the Court questions whether they

were even drafted or reviewed by an attorney. It is extremely troubling to the Court that Dunn-Prago flatly denies that Kyle was involved in a drug transaction and insists the drugs Defendants say he discarded into Dunn-Prago's home were planted there, *and then* attaches to her pleadings a transcript from a criminal trial in which Kyle was found guilty of drug possession on the night in question. She certainly isn't bound by the results of that criminal proceeding, but it makes the optics of her own case very, very bad.

Still, summary judgment standards being what they are, Dunn-Prago is entitled to tell her story to the jury on the hope that they will believe it over that of the Defendants.

**IT IS SO ORDERED**.

DATED: April 24, 2012

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge